[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13197

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KEITH ASTLEY TAYLOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60336-WPD-1

_____

Before JORDAN, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

Keith Taylor appeals his conviction for attempt to persuade, induce, or entice a minor to engage in unlawful sexual activity. *See* 18 U.S.C. § 2422(b). He argues that his conviction should be vacated because the government failed to prove he took a substantial step toward the commission of the offense. We conclude that sufficient evidence supports his conviction, so we affirm.

## I.

Taylor was a school crossing guard who took an interest in a 13-year-old girl who used his crossing. He sometimes asked her questions when she walked to school alone. One Tuesday, Taylor asked the girl to write her number on a piece of paper and drop it on the ground for him to pick up. The girl was uncomfortable and told her mom, who notified the police. At the officers' request, the girl wrote a detective's number on a piece of paper and dropped it for Taylor when she saw him on Thursday, two days later. The girl had no further part in the case.

Taylor called the number on the paper the next morning, Friday, and reached Special Agent Christina Dindial, who posed as the girl and identified herself as "Michelle." Over Friday and Saturday, Taylor and Michelle engaged in eight phone calls and numerous text messages. The government entered as evidence an audio recording and transcript of each phone call and a copy of the

call and text logs.[1]  The content of these communications formed the basis for the government's prosecution.

During the first call on Friday, which lasted about 20 minutes, Taylor told Michelle how much he "like[d] to see [her] everyday" and that he "really like[d] [her]."  He used possessive language: "I want you to be my nice girl.  I don't want you to have no boyfriend at the school because they just want one thing and not gonna work with you for now.  Cuz you're mine.  You're all mine.  Ok? . . . Can I have you?"  He asked her age, and she responded, "13."  He discussed "dat[ing]" her when she came "of age" and taking her out to the "movies" or "dinner" or "anything."  He told her not to tell her mom and to call him when her mom was not around.  And he invited her to come "sit down in [his] car and . . . talk a little" when he finished his crossing-guard shift at 4 p.m.  Michelle said she had to call him back and ended the call.

Taylor called Michelle twice later Friday afternoon, speaking for 12 minutes at around 4:15 p.m., and then again for 10 minutes about an hour later.  In these calls, Taylor called Michelle "babydoll" and said he "missed [her] today," pressing her to "please try to come to school earlier on Monday." He said to let him know if she needed anything, but to "keep it private" and not tell her

---

[1] Quotations in this opinion are derived from the transcripts and logs, the accuracy of which Taylor does not dispute, and are presented largely without corrections to spelling or grammar.

mom.  A third call from Taylor to Michelle that night was not answered.

Later Friday evening, Taylor and Michelle exchanged a few text messages, which led to another phone call just after midnight lasting more than 20 minutes.  In the texts, Taylor asked for "a picture," but Michelle ignored the request.  During the phone call, Taylor again offered flattery, telling Michelle he "like[d] [her] . . . from the first time [he] saw [her] walking."  He also urged her to keep their communications "private and secret," warned her that he was "jealous" and did not "want to see no little boy around or you two talk[ing]," and offered to give her lunch money and buy her things.

Taylor texted Michelle at 7:00 a.m. the next morning, Saturday.  When she responded two hours later, he told her that he had spent the night thinking about "how much i [heart emoji] u dear."  She said no one had ever told her that before, and he responded, "It's because they do not feel the way I do about[] u . . Can I ask u a question????"  After she agreed, he wrote, "Cool r u a virgin?? Please tell me the truth."  She said she was and had never had a boyfriend.  Taylor then asked if she could "meet [him] today for some [money bag emoji]."  When she asked if there were "goin anywhere," Taylor said he just wanted to give her some money and "talk a little."  He said he would pick her up at the crosswalk and then they would "go to some where else where no one know us."

22-13197                Opinion of the Court                5

At around 2:30 p.m. on Saturday afternoon, Taylor called Michelle again and they spoke for about 30 minutes. He suggested seeing her later that afternoon to give her some money. He also said he was "so happy" now that she was talking to him and that he was "going to fall in love with [her]" and "spoil [her]." She asked why he asked "that question" earlier, and Taylor referenced girls "[her] age" "do[ing] all kinds of crazy stuff," like "having sex with multiple partners," performing oral sex, and "getting pregnant." He told her to "just keep that virginity." Taylor then jealously warned her off from having a boyfriend or even talking to another boy, imploring her not to "break [his] heart." He stated, "[w]hen the right time come that you supposed to have sex, then I will know that . . . you did not tell me the truth . . . the first time."

While Taylor stressed that he was "not going to touch [her]" and would "control himself," he made clear he had "future plans" that involved her being his "lover" and having sex "[f]urther down the line." He called her his "girlfriend" and said he would wait for her to "become more mature. . . like when you reach about 14, 15 . . . I'm hoping when you reach there 15, 16 . . . by that time you are fully mature." She asked what he meant by fully mature, and he clarified: "Having sex." She asked if she had to wait until she was 14 to have sex, and he said, "You don't have to, no, no you don't, no, you can have sex right now. Right as you are now. You are fully mature." But he stressed that he would "try and control" himself and was "not going to rush no dick on [her]."

6                   Opinion of the Court              22-13197

Taylor took a call from his nephew before calling Michelle back again, speaking for an additional 33 minutes. Again, Taylor professed his feelings for her, promised to buy her things or give her money, and stressed secrecy about their relationship. He said that he was not "gonna sex [her] now," but that he "love[d]" her and "want[ed] [her] so bad," and he referred to himself as her "boyfriend."

Following this phone call, Taylor and Michelle exchanged more text messages. Taylor spoke first about "love" and then turned to "sex," which he described as "awesome." He added, "When u start to feel how nice it is . . . Honey i love u so much already . . . I will not fourse it on u dear but if u waunt it just say the word . . . When we talk tonight I will tell u what to do when u r doing it." She asked, "I thought u said I need to be 14 or 15 tho??" He repeated that he would "wait," but added, "if u waunt u can now," stating that "some . . . start at 12." He explained that sex "may hurt at the first time but it's great," and that she did "not have nutting to do but open it wide and let it go all the way in." When Michelle said she was "kinda nervous," he reassured her, stating, "some men have a big one some small. U do not have to be nervous. It's nice. I known u will be loving it." She responded she was "scared it will hurt." Taylor denied it would and said that's why her friends "love[d] it so much" and tried to "get it all the time."

By 5:00 p.m. that same Saturday, Taylor's besotted buoyancy had given way to suspicion and fear. He had received a call from a relative who heard about a "security crossing guard ask[ing]

a girl for [her] number." He called Michelle, who denied telling anyone, and then instructed her to "delete all the text . . . from [him]" on her phone and "talk on the phone only" going forward," adding that he was "very worried." About 30 minutes later, Taylor made his final call to Michelle to confirm that she had deleted everything. She continued to deny telling anyone, and he said, "I don't know, so something is wrong somewhere Michelle," and ended the call.

Taylor was arrested the next day, and he agreed to speak with police officers after waiving his *Miranda* rights. A recording of the interview was played to the jury. During the interview, Taylor claimed he asked for the girl's number to talk to her parents about her tardiness and that he texted her to encourage her to go to school. He knew she was "[a]bout 13, 14," while he was 74.

After officers played a portion of his recorded phone calls with Michelle, Taylor admitted to discussing sex with her and offering her money. But he denied wanting to have sex with her at that time, claiming that she was the one who "initiated all these things" and that "she keep pushing pushing." Nonetheless, he admitted he "wouldn't say no" to having sex with Michelle when she turned 14 or 15 years old. While he then backtracked and claimed he "wouldn't do that," he opined that "those are the right age that girls will start having sex," before lamenting he "didn't know this would have happen." He insisted he was not acting out of sexual desire, but rather he just wanted to look after her and offer encouragement.

**II.**

In 2021, a grand jury charged Taylor by indictment with one count of attempting to use a means of interstate commerce to persuade, induce, entice, and coerce a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b).  Taylor entered a plea of not guilty, and the case proceeded to a three-day trial in June 2022.

After the government rested its case, the defense moved for judgment of acquittal, arguing that the government had failed to prove that Taylor took a substantial step toward the commission of the crime.  In the defense's view, the evidence was insufficient because there was no indication Taylor intended to take any immediate action.  Taylor also renewed the motion after declining to present evidence.

The district court denied the motions for acquittal, finding that the evidence, when viewed in the light most favorable to the government, was sufficient for the jury to conclude that Taylor wished to have a sexual encounter with the victim and took a substantial step toward it before being ultimately frustrated by someone tipping off his relative.  The district court believed it was a "close issue," though.

The jury found Taylor guilty of the single § 2422(b) count.  The district court sentenced Taylor to 121 months of imprisonment, and this appeal followed.

### III.

We review *de novo* the denial of a motion for judgment of acquittal alleging insufficient evidence to sustain the verdict. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). In doing so, we view the evidence in the light most favorable to the government and draw all reasonable factual inferences in favor of the jury's verdict. *Id.* We will affirm if a reasonable jury could find that the evidence established guilt beyond a reasonable doubt. *Id.* at 1284–85.

Section 2422(b) makes it a crime to attempt to "knowingly persuade[], induce[], entice[], or coerce[]" any minor to engage in unlawful sexual activity using interstate commerce. 18 U.S.C. § 2422(b). A conviction for attempt under § 2422(b) requires proof that the defendant (1) intended to cause assent on the part of the minor, and (2) took actions that constituted a substantial step toward causing assent. *United States v. Lanzon*, 639 F.3d 1293, 1299 (11th Cir. 2011). The government need not prove "that [the defendant] acted with the specific intent to engage in sexual activity," or that he took a substantial step "toward causing actual sexual contact." *United States v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010).

To determine whether a defendant took a substantial step, we consider the totality of his conduct. *Id.* at 916. A substantial step occurs when "the defendant's objective acts mark his conduct as criminal such that his acts as a whole strongly corroborate the required culpability." *United States v. Murrell*, 368 F.3d 1283, 1288 (11th Cir. 2004).

In enticement cases, "the very nature of the underlying offense . . . necessarily contemplates oral or written communications as the principal if not the exclusive means of committing the offense." *United States v. Rothenberg*, 610 F.3d 621, 627 (11th Cir. 2010) (discussing § 2422(b) in the context of a sentencing enhancement). And "an individual evaluation by the fact finder of the defendant's intent as disclosed by his words or speech" is necessary to determine whether the defendant "cross[ed] the line between sexual banter and criminal persuasion, inducement[,] or enticement." *Id.* In *Rothenberg*, for example, we found that the defendant's sexually solicitous communications alone were sufficient to constitute a substantial step toward the commission of § 2422(b). *See id.*; *see also United States v. Yost*, 479 F.3d 815, 820 (11th Cir. 2007) ("[T]ravel is not necessary to sustain such a conviction.").

Taylor maintains that the evidence is insufficient to show a substantial step because he never arranged to meet a minor for sex; he never exchanged sexually explicit materials with a minor; he engaged in sex talk with a minor on a single day; and he repeatedly told the minor that he did not intend to have sex with her for at least 11 months. He claims that "[n]o appellate court in the country has upheld a § 2422(b) conviction under *any*—much less *all*—of those circumstances." He asserts that the evidence must show "some nexus to a concrete sexual encounter that is proposed or planned."

In evaluating whether sufficient evidence supports Taylor's conviction, though, our "aim is not to decide whether [a

defendant's] conduct is at least as 'criminal' as the conduct of others convicted under section 2422(b)." *Lee*, 603 F.3d at 916. None of our precedents "guesses at or purports to have identified the minimum conduct that [§] 2422(b) proscribes." *Id.* Rather, each precedent "holds no more than that a reasonable jury could have found that the defendant at issue violated [§] 2422(b)." *Id.*

We reach the same conclusion here. Viewing the totality of Taylor's conduct in the light most favorable to the verdict, sufficient evidence existed to support the jury's verdict. *See Rutgerson*, 822 F.3d at 1231–32.

To start, a reasonable jury could have found that Taylor intended to cause Michelle to assent to a future sexual encounter with him. *See Lanzon*, 639 F.3d at 1299. After initiating contact with "Michelle," who Taylor thought was a 13-year-old girl, Taylor engaged in conduct typically described as "grooming," the goal of which is "the formation of an emotional connection with the [minor] and a reduction of the [minor's] inhibitions in order to prepare the child for sexual activity." *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011).

Through various phone calls and text messages, which the jury heard and saw, Taylor flattered Michelle, offered to buy her gifts or give her money, professed his affection for her, warned her of his jealousy, and stressed secrecy about their relationship, from her mother most of all. As he did these things, seeking to establish an emotional connection and an exclusive and secretive relationship, he also repeatedly steered the conversation to sexual activity.

Taylor began by asking about the girl's virginity and suggested that girls her age or even younger were sexually active. He then made clear he wished to have sex with her. While he repeatedly stated he would wait until she was ready, he reassured her that she was "fully mature" already and did not "need to be 14 or 15," stating "if u waunt it just say the word." And he told her how "awesome" and "nice" sex was, even if it might hurt the first time, advising her to "open it wide and let it go all the way in." When she said she was scared or nervous about having sex, Taylor offered assurances that she would be "loving it" and that all her friends "love[d] it so much" and tried to "get it all the time."

This evidence of grooming behavior, combined with Taylor's attempt to destroy evidence of these communications and his post-arrest lies to the police about his conduct, was more than sufficient for a jury to reasonably conclude that Taylor intended to have Michelle assent to a future sexual encounter with him.

A reasonable jury also could have found that Taylor took "a substantial step toward causing [Michelle] to assent to sexual contact with him." *Lee*, 603 F.3d at 915. Taylor's telephone and text message "conversations went beyond mere preparation and constitute a substantial step sufficient to support his attempt conviction." *Id.* (cleaned up). After raising the issue of her virginity unprompted, he told her he wanted to have sex with her when she was "ready." He then took steps to ensure "ready" was sooner rather than later. Besides offering her gifts and affection, he instructed her how to have sex, encouraged her by telling her she

would enjoy the feeling and did not need to be scared or nervous, and said that he would not force her but that she did not have to wait, since she was physically ready and mature enough for sex.

While Taylor did not make any travel plans or concrete arrangements to meet Michelle for sex, as Taylor notes, a reasonable jury still could have found that he committed a substantial step because his "objective acts mark his conduct as criminal such that his acts as a whole strongly corroborate the required culpability." *See Murrell*, 368 F.3d at 1288. Unlike the main cases on which Taylor relies—*United States v. Howard*, 766 F.3d 314, 420–24 (11th Cir. 2014), *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008), and *Yost*, 479 F.3d at 817–18—which involved discussions with strangers over the internet, Taylor believed he was communicating with a 13-year-old girl he knew and saw regularly at his job as a school crossing guard. *See United States v. Geotzke*, 494 F.3d 1231, 1237 (9th Cir. 2007) (citing the "prior relationship" between the defendant and the victim in concluding that the defendant's efforts to lure the victim back to Montana for sex constituted a substantial step). He asked to meet Michelle multiple times over the weekend. And he indicated an intent to carry on the relationship with her, which he had infused with talk of sex, when he returned to work the following Monday and saw the real girl.

Based on the totality of Taylor's conduct, and despite its short duration (because Taylor was tipped off and abandoned his plans), a reasonable jury could have found that Taylor's communications were not just sexual banter or idle talk, but rather a genuine

14                    Opinion of the Court                    22-13197

and substantial attempt to induce or persuade a 13-year-old girl to engage in unlawful sexual activity with him. *See* 18 U.S.C. § 2422(b).

For these reasons, we affirm Taylor's conviction.

**AFFIRMED.**